**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LENA CHILDS, an individual;
DONALD CHILDS, an individual; T.
CHILDS, a minor by and through her
guardian ad litem, Lena Childs; A.
CHILDS, a minor by and through her
guardian ad litem, Lena Childs,

      *Plaintiffs - Appellees*,

  v.

SAN DIEGO FAMILY HOUSING,
LLC, a California Limited Liability
Corporation; LINCOLN MILITARY
PROPERTY MANAGEMENT LP, a
Delaware Limited Partnership,

      *Defendants - Appellants*,

and

INDEPTH CORPORATION, a
California Corporation,

      *Defendant - Appellee*.

No. 24-1256

D.C. No.
3:19-cv-02329-
JM-SBC

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted March 4, 2025
Pasadena, California

Filed August 28, 2025

Before: Mary H. Murguia, Chief Judge, and Gabriel P.
Sanchez and Holly A. Thomas, Circuit Judges.

Opinion by Judge Sanchez

## SUMMARY[*]

### Removal Jurisdiction

Affirming the district court's order remanding to state court an action that defendants had removed to federal district court, the panel held that the district court lacked federal enclave, federal officer, or federal agency jurisdiction.

Donald and Lena Childs, who rented military housing on Saipan Road within the Naval Amphibious Base Coronado, alleged negligence and other state law claims against San Diego Family Housing, a public-private venture created by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

federal statute, and Lincoln Military Property Management, the property manager.

The panel held that under 28 U.S.C. § 1447(d), federal courts of appeals generally lack jurisdiction to review a district court's remand order based on lack of subject matter jurisdiction. Here, however, the panel had jurisdiction to review the remand order in its entirety under a statutory exception to the jurisdictional bar because one of the asserted grounds for removal was federal officer removal under 28 U.S.C. § 1442.

The panel held that the district court lacked federal enclave jurisdiction. Under 40 U.S.C. § 3112 (the "1940 Act"), when the United States acquires land, its jurisdiction over that federal property depends upon its acceptance of jurisdiction. From 1941 to 1976, the United States acquired the lands now comprising Naval Amphibious Base Coronado, including the "Saipan Property." The panel held that there was no federal enclave jurisdiction under a theory that the government acquired the land through civil condemnation because there was no evidence of the government's assent to jurisdiction over the Saipan Property through the filing of notice or written consent. The panel rejected defendants' argument that the 1940 Act, and its notice-filing requirement, did not apply on the theory that the relevant parcel was "made" by the United States by dredging and filling the San Diego Bay and therefore was not "acquired."

The panel held that the district court lacked federal officer removal jurisdiction under 28 U.S.C. § 1442, which required defendants to demonstrate that they were persons within the meaning of the statute; there was a causal nexus between defendants' actions, taken pursuant to a federal

officer's directions, and plaintiffs' claims; and defendants could assert a colorable federal defense. The panel affirmed the district court's determination that defendants did not meet the causal nexus requirement because they did not show how their challenged actions in failing to reasonably manage water intrusion and mold contamination at the Saipan Property occurred because of what they were asked to do in fulfilling the governmental function of housing military service members and their families.

The panel held that the district court lacked federal agency jurisdiction under 28 U.S.C. § 451 because, under the six-factor test of *In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988), defendant San Diego Family Housing was not a federal agency.

## COUNSEL

Christian B. Clark (argued), Lenden F. Webb, and Katherine E. Cervantes, Webb Law Group APC, Fresno, California, for Plaintiffs-Appellees.

Kristin N. Reyna DeHart (argued) and Matthew P. Nugent, Gordon Rees Scully Mansukhani LLP, San Diego, California; Don Willenburg, Gordon Rees Scully Mansukhani LLP, Walnut Creek, California; for Defendants-Appellants.

Christina Matian, Bremer Whyte Brown & O'Meara LLP, San Diego, California, for Defendant-Appellee.

Daniel L. Winik (argued) and Michael S. Raab, Attorneys, Appellate Staff; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States

Department of Justice, Washington, D.C.; Tara K. McGrath, United States Attorney, Office of the United States Attorney, United States Department of Justice, San Diego, California; for Amicus Curiae the United States of America.

## OPINION

SANCHEZ, Circuit Judge:

Plaintiffs Donald and Lena Childs rented military housing within the Naval Amphibious Base Coronado. During their lease, the Childs dealt with water-intrusion and mold contamination issues that allegedly damaged their personal property and impacted their health. According to Plaintiffs, Defendants San Diego Family Housing, a public-private venture created by federal statute, and Lincoln Military Property Management, the property manager, were aware of these issues and did not adequately remediate the problem. Plaintiffs filed the instant action in state court asserting negligence and other state law claims. Defendants removed the action to federal district court on the basis of federal enclave, federal agency, and federal officer jurisdiction. After assessing each of these grounds for removal, the district court concluded that it lacked jurisdiction over the action and remanded to state court. We conclude that no basis for federal jurisdiction applies and affirm.

I.

A.

Defendant San Diego Family Housing ("SDFH") is a public-private venture between the Navy and Lincoln/Clark

San Diego, LLC under the Military Housing Privatization Initiative ("MHPI"). *See* 10 U.S.C. §§ 2871–2885. SDFH contracted with Lincoln Military Property Management ("Lincoln") to provide property management services to the Silver Strand I housing community, which includes military housing on Naval Amphibious Base Coronado ("NAB Coronado"). In 2016, Plaintiffs Donald and Lena Childs, with their minor children, leased a home from SDFH at 1333 Saipan Road, Coronado, California ("the Saipan Property").

Soon after Plaintiffs moved into their home, the property began to suffer from repeated water-intrusion and related mold contamination. According to Plaintiffs, these problems caused damage to their personal property and eventually impacted the family's health, causing fatigue, shortness of breath, chronic headaches, and other symptoms. After reporting these issues to Defendants, Lincoln sent InDepth, a mold remediation company, to inspect the property. InDepth discovered visible mold in multiple areas of the home and allegedly told Plaintiffs that there "[was] no reason to run any tests" because the mold was visible. InDepth informed Lincoln of its findings, and Lincoln provided temporary relocation assistance to the Childs while InDepth performed remediation services.

After Plaintiffs were told that the remediation service was successfully completed, Plaintiffs requested documentation verifying that the mold had been addressed, which Lincoln allegedly refused to provide. Upon their return to the property, Plaintiffs engaged their own mold testing service provider who ran tests that indicated heightened levels of hazardous mold. Plaintiffs told Lincoln and InDepth about the test results and allege that Defendants dismissed their concerns and insisted that the home was habitable. Plaintiffs refused to remain at the property, and,

after rejecting alternative housing in the same community, Defendants immediately ceased paying the Childs' relocation costs. Defendants allegedly refused to acknowledge the presence of mold and took no further steps to properly remediate the property.

B.

In 2019, Plaintiffs brought suit in state court against SDFH, Lincoln, and InDepth, asserting claims for negligence, private nuisance, breach of contract, breach of the implied warranty of habitability, breach of the implied covenant of peaceful and quiet enjoyment, and constructive eviction. SDFH and Lincoln removed the action to federal court on the basis of federal enclave, federal officer, and federal agency jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1442(a)(1). Upon removal, SDFH and Lincoln moved to dismiss the action under a claim of derivative sovereign immunity pursuant to the *Yearsley* doctrine. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940). The district court denied the motion, and Defendants appealed. We held that the district court's order rejecting dismissal was not an immediately appealable collateral order and dismissed the appeal. *See Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1099 (9th Cir. 2022).

Following remand, SDFH and Lincoln moved for summary judgment on the grounds that *Yearsley* provided them derivative sovereign immunity and that the legal effect of federal enclave jurisdiction precluded most of Plaintiffs' state law claims.[1] The United States then filed a Statement

---

[1] SDFH and Lincoln also challenged Plaintiffs' settlement with InDepth. The district court did not address the propriety of that settlement in its remand order, and Defendants do not seek review of this issue on appeal.

of Interest before the district court asserting that (1) *Yearsley* did not apply to Defendants, (2) the Saipan Property was not within a federal enclave, and (3) under this court's intervening precedent in *Lake v. Ohana Military Communities, LLC*, 14 F.4th 993 (9th Cir. 2021), the district court lacked federal officer or agency jurisdiction.

The district court ordered supplemental briefing and eventually rejected all of Defendants' proffered grounds for federal jurisdiction. Specifically, the district court found that Defendants failed to establish that the Saipan Property was within a federal enclave because there was no evidence that the United States had retained or assented to exclusive federal jurisdiction over the property. Next, the district court concluded that Defendants failed to show the requisite causal nexus between the challenged actions and the federal government's involvement in Defendants' housing management to establish federal officer jurisdiction under 28 U.S.C. § 1442(a)(1). Finally, the district court concluded that Defendants were unable to establish federal agency jurisdiction under the six-factor test of *In re Hoag Ranches*, 846 F.2d 1225, 1227–28 (9th Cir. 1988). The district court remanded the case to state court.[2] Defendants timely appealed.

---

[2] In its remand order, the district court also ruled on Defendants' evidentiary objections, sustaining their objection to an unauthenticated parcel map of NAB Coronado, thereby declining to take judicial notice of the parcel map. The district court also sustained, in part, Defendants' objections to the declaration of a senior land surveyor, Lonie Cyr, determining that legal conclusions as to whether the federal government exercises exclusive jurisdiction over the Saipan Property were improper witness testimony.

II.

Before reaching the merits of these claims, we must first assess our appellate jurisdiction to review the district court's remand order. Federal courts of appeals generally lack jurisdiction to review a district court's remand order based on lack of subject matter jurisdiction. *See* 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise," subject to certain exceptions); *see also Yakama Indian Nation v. State of Wash. Dept. of Revenue*, 176 F.3d 1241, 1248 (9th Cir. 1999) ("Remand orders based on a defect in removal procedure or lack of subject matter jurisdiction are immune from review even if the district court's order is erroneous."). Nonetheless, § 1447(d) provides for two exceptions to this bar. Under the statute, a remand order is reviewable for actions initially removed pursuant to the federal officer removal statute codified at § 1442. *See* 28 U.S.C. § 1447(d) ("[A]n order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise."). In their notice of removal, SDFH and Lincoln asserted federal enclave jurisdiction under § 1331 as well as federal officer and federal agency jurisdiction under § 1442(a)(1). Because one of the asserted grounds for removal was § 1442, we have jurisdiction to review the remand order in its entirety. *Id.* § 1447(d); *see also BP P.L.C. v. Mayor and City Council of Baltimore*, 593 U.S. 230, 238 (2021) (explaining that the scope of appellate jurisdiction extends to the "whole of [the district court's] order" when a defendant cites § 1442 as a ground for removal).

### III.

We review de novo the district court's decision to remand a removed case and its determination that it lacks subject matter jurisdiction. *Lively v. Wild Oats Mkts., Inc*. 456 F.3d 933, 938 (9th Cir. 2006). The defendant bears the burden of proving that the requirements for removal jurisdiction have been met. *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). On appeal, Defendants renew their contentions that subject matter jurisdiction exists under (1) 28 U.S.C. § 1331 because the Saipan Property is located within a federal enclave, (2) 28 U.S.C. § 1442 (federal officer removal statute) because SDFH and Lincoln operated under the Navy's oversight and control in dealing with the Childs' complaints, and (3) 28 U.S.C. § 1442 because SDFH qualifies as a federal agency. We consider each of these arguments in turn.

### A.

Federal enclave jurisdiction is dependent on the federal government's exercise of exclusive legislative jurisdiction. *See Lake*, 14 F.4th at 1003–04; *Paul v. United States*, 371 U.S. 245, 263–64 (1963); *United States v. Jenkins*, 734 F.2d 1322, 1325–26 (9th Cir. 1983). The Enclave Clause of the Constitution authorizes Congress to:

> [E]xercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for

> the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17.  Beyond the Enclave Clause's specified method of establishing exclusive federal jurisdiction through the purchase of land with a state's consent, the Supreme Court has also recognized two other methods by which the federal government can acquire exclusive jurisdiction over land.  First, Congress may condition the admission of a state to the Union on a cession of jurisdiction of land within that state.  *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 526–27 (1885).  And second, states themselves may cede legislative jurisdiction over land within their borders to the federal government.  *Id.* at 540–42.

Defendants' arguments for enclave jurisdiction over the Saipan Property do not involve a straightforward application of any of these methods.  Instead, Defendants rely on an intricate web of state and federal statutes to support their theory.  Therefore, to determine whether federal enclave jurisdiction exists over the Saipan Property requires a brief historical detour.

In 1897, California passed a law ceding "to the United States of America exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes."  1897 Cal. Stat. ch. 56, § 1.[3]  In 1940, Congress passed legislation applying to

---

[3] This state law also required the United States to provide "a sufficient description by metes and bounds" of the land and that "a map or plat of such lands" be filed in "the proper office of record in the county" in

land acquired thereafter which required the federal government's assent to exclusive or partial jurisdiction over federal property located within state boundaries. *See* 40 U.S.C. § 255 (1940) (re-codified at 40 U.S.C. § 3112); *Paul*, 371 U.S. at 264; *Adams v. United States*, 319 U.S. 312, 313 (1943). The 1940 Act provided that "it shall be conclusively presumed that no [exclusive or partial] jurisdiction has been accepted," "[u]nless and until the United States has accepted jurisdiction over lands hereafter to be acquired." 40 U.S.C. § 255 (1940). The 1940 Act mandated that the federal government indicate its acceptance of jurisdiction by "filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated." *Id.* Following re-codification, the statutory text makes clear that "[i]t is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires." 40 U.S.C. § 3112(a).

From 1941 to 1976, the United States acquired the lands now comprising NAB Coronado, including the Saipan Property, in a series of land transactions as well as by dredging and filling portions of the San Diego Bay. The precise mode and date of the federal government's acquisition of the Saipan property, however, is contested by the parties.

The United States and Plaintiffs rely on a declaration by Lonie Cyr, a senior land surveyor for the Navy, who attests that the government did not acquire the lands where the Saipan Property is located until 1955 through civil

which the land is located. 1897 Cal. Stat. ch. 56, § 1. The statute was amended with minor modifications in 1943, *see* 1943 Cal. Stat. ch. 134 § 114, but was later repealed in 1947, *see* 1947 Cal. Stat. ch. 1532.

condemnation. [4]    According to Plaintiffs and the United States, because the acquisition of land through civil condemnation occurred after the 1940 Act, federal enclave jurisdiction over the Saipan Property requires the federal government's assent to exclusive jurisdiction by "filing a notice of . . . acceptance with the Governor of [the] State or in such other manner as may be prescribed by the laws of the State where [the] lands are situated."   40 U.S.C. § 255 (1940).  By this time, California had also enacted legislation conditioning any transfer of jurisdiction on, *inter alia*, the federal government's written assent and the State Lands Commission's declaration that the transfer was "in the interest of the State."  1951 Cal. Stat. ch. 875, § 1.  Because Defendants have not offered any evidence that the federal government assented to exclusive federal jurisdiction over this property by filing notice or written consent, there can be no federal enclave jurisdiction under this theory.

Defendants respond that the 1940 Act (and its notice-filing requirement) does not apply to the Saipan Property because the relevant parcel was not "acquired" through civil condemnation in 1955; it was instead "made" by the United States by dredging and filling the San Diego Bay to create a seaplane base between 1941 and 1943.  According to Defendants, the United States "has sole ownership over land created in this manner," and they rely on *United States v. F.E.B. Corp.*, 52 F.4th 916, 926–29 (11th Cir. 2022) to

---

[4] Defendants' claim that this proffered fact was excluded by the district court is incorrect.  The district court expressly overruled Defendants' objections concerning the factual contentions in the Cyr Declaration, such as how the property came into the United States' ownership. *See supra* n. 2.

buttress their arguments.[5]  But, as the 1940 Act clarified, the United States' acquisition and ownership of land does not require that the United States obtain exclusive jurisdiction over that land.  *See* 40 U.S.C. § 255 (1940); 40 U.S.C. § 3112(a).    Therefore, Defendants' claim of enclave jurisdiction requires two predicates: (1) a factual predicate that the Saipan Property originated from the United States' own dredging and filling operation from 1941 to 1943 and not the 1955 condemnation proceeding; and (2) a legal predicate that land created by the United States for its own use lies outside the scope of the 1940 Act because it was not "acquired" and instead passed exclusively to the United States based on California's 1897 ceding statute.  We need not resolve the parties' dispute over the factual predicate because Defendants' arguments fail as to the legal predicate.

The 1940 Act does not itself define the term "acquire." *See generally*, 40 U.S.C. § 255 (1940); *see also* 40 U.S.C. §§ 3101–3177.    "Where Congress does not furnish a definition of its own," courts "generally seek to afford a statutory term its ordinary or natural meaning." *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (quotation and citation omitted).  Under Black's Law Dictionary, the term "acquire" means "[t]o gain possession or control of" or "to get or obtain" "by any means."  *Acquire*, Black's Law Dictionary (12th ed. 2024); *see also Acquire*, Black's Law Dictionary (3d ed. 1933) ("[t]o become the owner of property; to make

---

[5] That case involved a dispute about ownership of an island created by the Navy via dredging activities near Key West, Florida.  The question presented was not about whether the United States held exclusive jurisdiction over the island, but whether the United States had a claim of ownership over the island pursuant to the Submerged Lands Act, 43 U.S.C. §§ 1301–1315.

property one's own" "[t]o gain permanently"). Under both its contemporary and historical plain meanings, the term "acquire" contemplates the United States' acquisition of land created by dredging and filling operations and therefore the Saipan Property falls within the scope of the 1940 Act's requirements.

This plain meaning of the term "acquire" also accords with the purpose of the 1940 Act. The Act followed several Supreme Court decisions that addressed "controversies concerning the relation of federal and state powers over government property," and, specifically, whether the federal government's acquisition of property resulted in exclusive federal jurisdiction. *Adams*, 319 U.S. at 314 (collecting cases). Before enactment, federal government officials conducted a cooperative study which resulted in legislation "aimed at giving broad discretion to the various agencies in order that they might obtain only the necessary jurisdiction." *Id.* The 1940 Act achieved this goal by enshrining a presumption against federal jurisdiction in the absence of express federal assent. *See* 40 U.S.C. § 255 (1940).

Defendants rely on a definition of "acquire" from an inapplicable statute relating to timber resources on federal lands. *See* 16 U.S.C. § 620e (noting the definitions of § 620e apply only "[f]or purposes of sections 620 to 620j of this title [16 U.S.C. §§ 620–620j]"). And the relevant chapter at issue, Title 40, Subtitle II, Chapter 31, does not contain any provision which would suggest that the term "acquire" should be limited to lands obtained via transaction as opposed to creation by the government itself. *See generally*, 40 U.S.C. §§ 3101–3177.

Even if we were to credit Defendants' contention that the land was created by the United States and therefore the 1940

Act does not apply because there was no "acquisition," the California 1897 statute does not save their argument. That statute provided for the transfer of exclusive jurisdiction only in lands "which may hereafter be ceded or conveyed to said United States for" military purposes or defense. 1897 Cal. Stat. ch. 56, § 1. If, under Defendants' theory, the land was created by the United States through dredging and filling, the land cannot have been ceded or conveyed *by* the State of California *to* the United States.

Finally, Defendants presented a different theory for exclusive jurisdiction before the district court that merits some discussion. Defendants earlier argued that the federal government retains exclusive jurisdiction over lands created by dredging and filling for the government's use under the Submerged Lands Act. *See* 43 U.S.C. § 1313(a). This, too, is incorrect. Although § 1313 carves out an exception to the Act's general transfer of federal title and claims to submerged lands within the territorial boundaries of states, nothing in the text of § 1313 suggests that it extinguished state jurisdiction over submerged lands within its territories. *Id*. Indeed, Congress' purpose in passing the Submerged Lands Act was "not for the Federal Government to retain exclusive jurisdiction over navigation of the waters above the submerged lands, but for the Federal Government to retain concurrent jurisdiction over those waters." *Barber v. State of Hawai'i*, 42 F.3d 1185, 1191 (9th Cir. 1994).

Accordingly, regardless of the parties' competing versions of events as to how the Saipan Property came into the United States' *possession*, Defendants have failed to provide any evidence that the federal government has assented to exclusive *jurisdiction* over it so as to establish federal enclave jurisdiction.

B.

The district court did not err in determining that it lacked original jurisdiction under the federal officer removal statute. Under 28 U.S.C. § 1442(a), federal courts may exercise removal jurisdiction over actions commenced in state court against an "officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." To satisfy federal officer removal jurisdiction under § 1442(a), defendants must demonstrate (1) that they are persons "within the meaning of the statute;"[6] (2) that "there is a causal nexus between [their] actions, taken pursuant to a federal officer's directions, and plaintiff's claims;" and (3) that they "can assert a colorable federal defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006) (cleaned up).

The district court correctly determined that Defendants did not meet the causal nexus requirement. Under this requirement, a private defendant must show that they were "acting under a federal officer in performing some act under color of federal office" and "that such action is causally connected with the plaintiff's claims against it." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022). Here, Plaintiffs' claims relate to SDFH and Lincoln's alleged failure to properly inspect, warn of, cure, and otherwise reasonably manage the water-intrusion and mold contamination issues that the Childs family experienced at

---

[6] It is undisputed that Defendants are "persons" for the purposes of § 1442(a).

the Saipan property. [7]     In their Notice of Removal, Defendants asserted that they were acting under naval officers in "fulfill[ing] the governmental function of housing military service members and their families," and they further claimed that "the alleged bodily injuries and property damage arose from [SDFH] and [Lincoln's] performance of their duties to the Navy under the Operating Agreement and Property Management Agreement."

Although Defendants have proffered numerous pieces of evidence in support of their causal nexus theory, they fail to show how their challenged actions occurred "*because* of what they were asked to do by the Government." *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)); *see also Stirling v. Minasian*, 955 F.3d 795, 800 (9th Cir. 2020) (explaining that the "relationship between someone acting under a federal officer and the federal officer 'typically involves subjection, guidance, or control.'" (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018)). Rather, the agreements, policies, letters, and declarations offered by Defendants demonstrate, at most, only general federal oversight over Defendants' housing management efforts and compliance with applicable laws and regulations.

Our decision in *Lake v. Ohana Military Communities* is instructive to our analysis. There, the defendant was also a military housing public-private venture established under the MHPI. 14 F.4th at 999. In holding that the defendant

---

[7] Plaintiffs also assert that many of Defendants' actions were in violation of state housing laws, their lease agreements, and Defendants' own policies.

failed to demonstrate a causal nexus between its alleged failure to warn of pesticide contamination on the premises and the Navy's oversight, we emphasized the "sole and exclusive management and control" afforded to the government's private counterpart and the defendant's inability to show that the Navy's involvement in other aspects of the housing arrangement amounted to anything more than mere "consent power over aspects of the housing arrangement." *Id.* at 1004–05. After determining that no federal officer had "directed" the defendant to take the challenged actions, we concluded that "the central issue" in the causal nexus analysis was "unmet." *Id.* at 1005.

As in *Lake,* the Operating Agreement here shows that the government's private counterpart, Lincoln/Clark San Diego, LLC, enjoyed *"*exclusive management and control of the business of [SDFH]" as well as "full authority to take all actions necessary or appropriate to pursue the business and carry out the purpose of the Company." *See id.* at 1004–05. Defendants' reliance on other provisions of the Operating Agreement relating to income sharing and approval rights over matters like cash flow, contracts and capitalization, hiring, and other clerical duties does not demonstrate federal control or direction over the relevant actions at issue here— mold testing and remediation. *See id.* at 1004 ("It is not enough that the regulation is highly detailed and . . . the private firm's activities are highly supervised and monitored." (quotations and citation omitted)).

Defendants also point to their Ground Leases for evidence of federal control, but these agreements explicitly assigned responsibilities, costs, and liability over mold

management during the applicable term to SDFH. [8] Moreover, we have previously explained that "the federal government's willingness to lease federal property . . . to a private entity for that entity's commercial purposes does not, without more, constitute the kind of assistance required to establish that the private entity is 'acting under' a federal officer." *Cnty. of San Mateo*, 32 F.4th at 760.

Defendants rely on the Navy's input and consent over their Operation and Management Plan ("O&M Plan"), which included a Mold Management Plan that SDFH was required to prepare. But the O&M Plan reflects minimum standards under applicable laws, regulations, project requirements, and housing policies. Nothing in the O&M Plan's mold management guidance constrained Defendants' capacity to inspect premises for mold and water contamination, [9] prevented Defendants from further investigating mold-related complaints, or restricted Defendants' capacity to remediate mold-related issues within the premises.

Defendants' reliance on the Navy's Mold Policy is similarly unavailing as that policy also lacks any restraining or controlling language. Rather, the "policy"—if it can be called that—informs readers of pertinent facts about the hazards of mold, the efficacy of testing, and general

---

[8] Although the Ground Leases assigned liability for injuries to third parties from *pre-existing* mold contamination to the government, they provide that SDFH is "responsible for any claims or liability for injury to persons to the extent resulting from . . . the disturbance of a Mold Condition during the applicable Term of [SDFH's] Lease."

[9] The testing guidance contained in the O&M Plan reflects only what maintenance technicians are required to *tell* residents when they request testing. The O&M Plan otherwise does not appear to explicitly limit additional testing.

recommendations by expert bodies.  The same can be said of the Navy's periodic "letter directives" to MHPI-created entities, such as SDFH, as these letters largely describe only general guidelines for minimum housing standards or statutory requirements under 10 U.S.C. § 2891a.  As the Supreme Court explains, "[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson v. Philip Morris Cos.*, *Inc.,* 551 U.S. 142, 153 (2007).  In any event, these letters were sent in 2020 and therefore post-date the relevant time period.  Accordingly, nothing in these letters suffices to demonstrate that Defendants acted pursuant to the Navy's instructions with regard to mold inspection and remediation.

Given the dearth of evidence suggesting federal involvement in or control over Defendants' mold management practices, the cases in which we have found a causal nexus are readily distinguishable.  In *Leite v. Crane Co*, the plaintiffs brought suit based on the defendants' alleged failure to warn of potential asbestos exposure.  749 F.3d at 1119–20.  There, the defendant-entity submitted evidence showing the Navy's knowledge of asbestos hazards, its participation in the procurement of hazardous equipment, and its "detailed specifications regulating the warnings that equipment manufacturers were required to provide."  *Id.* at 1120.  Similarly, in *Goncalves By and Through Goncalves v. Rady Children's Hosp. San Diego,* the challenged subrogation lien resulted directly from the government's delegation to the defendant-insurer its authority to pursue subrogation claims on behalf of the government.  865 F.3d at 1245.

Although we interpret the federal officer and agency removal statute "broadly in favor of removal," *Durham*, 445

F.3d at 1252, and "credit the defendant's theory of the case," Defendants "must allege facts, not mere legal conclusions, in compliance with the pleading standards established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Leite*, 749 F.3d at 1121–22, 1124. As we have explained, Defendants' allegations suggest, at most, that the Navy "direct[ed], supervise[d], and monitor[ed]" their general housing activities, which does not plausibly meet their causal nexus burden with regard to their challenged conduct. *Lake*, 14 F.4th at 1004 (quoting *Fidelitad*, 904 F.3d at 1100). Because "the central issue in the causal nexus analysis . . . is unmet," *id.* at 1005 (quotation and citation omitted), Defendants have failed to establish federal officer jurisdiction.[10]

## C.

Defendants further contend that the instant case is removable pursuant to 28 U.S.C. § 1442(a)(1) because SDFH is a federal agency.[11] To determine whether an entity is an "agency" under 28 U.S.C. § 451, this court considers the factors laid out in *In re Hoag Ranches*, 846 F.2d at 1227–28. These factors are (1) "the extent to which the alleged

---

[10] Because we conclude that no federal officer directed Defendants to take the challenged actions, we do not address Defendants' arguments that SDFH "was performing acts delegated to it by the Navy," *Lake*, 14 F.4th at 1005 n.4, nor do we reach the question of whether Defendants asserted a "colorable federal defense," *Durham*, 445 F.3d at 1251.

[11] For purposes of § 1442(a)(1), a federal "agency" is defined as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense." 28 U.S.C. § 451; *see also Lake*, 14 F.4th at 1005 (applying § 451 to § 1442(a)(1)).

agency performs a governmental function," (2) "the scope of government involvement in the organization's management," (3) "whether its operations are financed by the government," (4) "whether persons other than the government have a proprietary interest in the alleged agency and whether the government's interest is merely custodial or incidental," (5) "whether the organization is referred to as an agency in other statutes," and (6) "whether the organization is treated as an arm of the government for other purposes, such as amenability to suit under the Federal Tort Claims Act." *Id.*

Regarding the first factor, Defendants note that "SDFH took over operations for a significant volume of military housing that was affordable to Navy servicemembers within their [Basic Allowance for Housing ("BAH")] . . . something the Navy previously provided on its own." This argument, however, is foreclosed by *Lake*, where we explained that "leasing housing on a military installation under the MHPI" is not necessarily a "historically and exclusively governmental function" and "[m]erely leasing housing to a servicemember cannot itself be a governmental function" since "BAH can be used on or off a military base." 14 F.4th at 1005.

Under the second factor, the government's control over SDFH's housing operations is limited. As in *Lake*, the "exclusive management and control" conferred to SDFH's private managing member, Lincoln/Clark San Diego, LLC, coupled with the Navy's "limited rights and responsibilities," demonstrate that "the government only ever had limited control." *Id.* at 1006. "At most, this factor does not weigh heavily in either direction" because an entity subject to federal regulation does not, by virtue of that

regulation, become controlled by the federal government. *Id.* at 1006.

As to the third factor, which relates to government financing, Defendants highlight that the United States capitalized SDFH at a rate of nearly twice the private partner. But as we observed in *Lake,* "[a]n initial financial contribution does not show ongoing operational financing." *Id.* at 1006. And Defendants have not presented any evidence that the United States continued to finance SDFH's operations beyond its contributions during the development period.

Under the fourth factor, whether any person other than the government has a proprietary interest in the alleged agency, the answer is clearly yes. As noted above, Lincoln/Clark San Diego, LLC, retains *"*exclusive management and control of the business of [SDFH]." *See id*. at 1006. Defendants' reliance on *Acron Investments, Inc. v. Federal Savings & Loan Insurance Corp*., is misplaced. In *Acron,* we concluded that the Federal Savings & Loan Insurance Corporation was a federal agency based on the government's proprietary interest in the defendant government corporation. 363 F.2d 236, 239–40 (9th Cir. 1966), *cert denied*, 385 U.S. 970 (1966). *Acron*, however, is distinguishable because that case addressed the character of a government corporation in which the government had once owned all stock but had since retired it. *Id.* at 240. Here, the government has never retained an equivalent interest in SDFH. Rather, any interest the government retains in SDFH is merely "custodial" or "incidental" in light of Lincoln/Clark San Diego, LLC's exclusive control over the venture's business. *Hoag Ranches,* 846 F.2d at 1228; *see also Lake,* 14 F.4th at 1006 (finding the government's

interest in the defendant public-private venture insufficient to satisfy factor four).

With respect to the fifth factor, Defendants do not cite any statute that identifies SDFH or any public-private venture formed for the purpose of military housing as an agency. And Defendants concede that they do not satisfy factor six. Balancing these factors, we conclude that Defendants have not demonstrated that SDFH is a federal agency under 28 U.S.C. § 1442(a)(1).

## IV.

In light of the foregoing, the district court correctly determined that Defendants have not carried their burden in demonstrating federal enclave jurisdiction under 28 U.S.C. § 1331 or federal officer or agency jurisdiction under 28 U.S.C. § 1442(a)(1).

**AFFIRMED.**